Horace William PAGE, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

No. 2003–SC–0067–MR.

Supreme Court of Kentucky.

Nov. 18, 2004.

---

Shelly R. Fears, Assistant Public Advocate, Department of Public Advocacy, Frankfort, Counsel for Appellant.

Gregory D. Stumbo, Attorney General of Kentucky, John R. Tarter, Assistant Attorney General, Criminal Appellate Division, Office of the Attorney General, Frankfort, Counsel for Appellee.

Opinion of the Court by Chief Justice LAMBERT.

Appellant, Horace William Page, appeals as a matter of right[1] from the final judgment of the Allen Circuit Court sentencing him to fifty-two (52) years imprisonment on two (2) counts of second-degree manslaughter, two (2) counts of first-degree wanton endangerment, tampering with physical evidence, failing to render aid and assistance, and being a persistent felony offender in the second degree. The issues are whether the trial court erred when it admitted photographs of a deceased person and a telephone pole with brain matter on it, whether the trial court erred in denying Appellant's motion for directed verdict as to the charge of tampering with physical evidence, and whether the consecutive sentencing was contrary to KRS 532.110(1)(c).

On the evening of September 23, 2001, Appellant was visiting Shawta Lynn Birge, his sister, at her home. Appellant's brother, two nieces, and roommate were also at the residence. At approximately 10:00 p.m., Appellant, his brother, Shawn Page, Shawta, and her two daughters left in Appellant's car to go to his home. Roger Martin, Appellant's roommate, drove separately.

Appellant had been drinking earlier in the evening. During the drive Appellant lost control of the car, skidded off the road, and struck a telephone pole. After the impact, Appellant pulled the unconscious Shawta out of the vehicle, and left the scene of the accident to seek help:

Appellant's roommate, Roger Martin, had been following Appellant. Martin saw Appellant's lights disappear, but thought that Appellant had turned around to get Shawta's daughter's medicine. Martin continued on his way home. When Appellant and his passengers did not show up, Martin became worried and returned to look for them. Martin found Appellant walking back toward the wreck after attempting to get help at a nearby residence. Martin left to find David Page, another of Appellant's brothers, and brought him to the scene of the accident.

Martin and David Page attempted to remove Shawn Page and Shawta's children from the rear seat of Appellant's car. Martin said that Bethany Birge, Shawta's daughter, had a skull that felt like an "egg shell," and that after touching it there was blood on his hands. David Page removed the children from the car, but was unable to remove his brother, Shawn Page.

Appellant was on probation from a previous felony conviction when the accident occurred. Martin told David Page that Appellant could "get five years" for being in trouble while on probation. David Page told Martin and Appellant to leave, and promised to tell the police that he had

1. Ky. Const. § 110(2)(b).

been driving Appellant's car when the accident occurred. After Martin and Appellant returned to their home, David Page remained at the scene and told the police that he had been the driver.

After arriving at home, Martin made two telephone calls to 911. In his first phone conversation, Martin told the 911 operator that a third party had reported the accident to him. Martin stated later that he had lied to the 911 operator because he was afraid Appellant would get into trouble for driving under the influence. In his second call, after Appellant had cleaned off the dirt and blood from the accident from his body, Martin told the 911 operator that David Page had been driving Appellant's car when the wreck occurred.

Shawta and Bethany Birge were taken to Bowling Green Medical Center where they died in the early hours of Saturday, September 24, 2001.

During the accident investigation conducted by Allen County Deputy Sheriff Terry Beach and Kentucky State Police Trooper Dathan Tarrance, David Page recanted the statement that he had been driving the car at the time of the wreck. David Page told the officers that Appellant had been driving the car when the accident occurred. When police located Appellant on the evening of September 24, the alcohol that had been in his system at the time of the accident and any physical signs of intoxication had dissipated. Tarrance believed the physical evidence at the scene indicated that the driver of the vehicle was impaired at the time of the accident, but that it was not possible to get an analysis of Appellant's blood content at the time of the wreck.

On appeal, Appellant first argues that the trial court erred by introducing into evidence two photographs of the accident scene: one of the deceased Bethany Birge, lying in a field, marked as Commonwealth's Exhibit 7; and one of brain tissue on a telephone pole, marked as Commonwealth's Exhibit 8. Appellant suggests that the defense's willingness to stipulate that the impact with the telephone pole was the cause of Bethany Birge's death should have prevented the photographs from being admitted. Appellant contends that these photographs should have been excluded because their probative value was substantially outweighed by the danger of undue prejudice as prohibited by KRE 403.[2]

At trial, the Commonwealth moved to introduce three photographs: two of Bethany Birge's body, and one of the telephone pole with brain matter on it. Appellant initially objected to the introduction of two pictures of the body, an objection which the trial court sustained. The Commonwealth was allowed to introduce one of the photographs of Bethany's body, Commonwealth's Exhibit 7. Appellant did not voice further objections to the admission of the single photograph of Bethany's body, and as such, failed to preserve the issue for review. Appellant reiterated his objection to the photograph of the telephone pole.

Appellant argues that his willingness to stipulate that the vehicle's impact with the pole was the cause of death for Shawta and Bethany Birge should have led to the photograph's exclusion. Appellant believes that because he offered to stipulate that the telephone pole was the cause of death, no material fact as to the cause of death

**2.** KRE 403 provides:
Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of undue prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence.

existed. Therefore a photograph depicting the scene of Bethany's death would not be probative to prove a material fact in issue. Appellant posits that due to its prejudicial effect and lack of relevance to a disputed fact, the photograph should have been excluded pursuant to KRE 403.

In determining whether to exclude evidence a trial court should consider three factors: the probative worth of the evidence, the probability that the evidence will cause undue prejudice, and whether the harmful effects substantially outweigh the probative worth.[3] Broad discretion is given to the trial court in determining the admissibility of evidence, such that an appellate court should only reverse a ruling under KRE 403 where there has been clear abuse of discretion.[4] Although the photograph did show brain matter on the telephone pole, as a general rule a photograph is not inadmissible because it is gruesome and the crime is heinous.[5] It is well decided that the prosecution is permitted to prove its case by competent evidence of its own choosing, and that the defendant may not stipulate away parts of the case that he does not want the jury to see.[6] Moreover, this Court has held that in order for a jury to be able to size up a case fairly and wisely it must be allowed to gain a reasonable perspective, and that can best be done by permitting it to see an unadulterated picture.[7]

The trial court determined that the photograph of the telephone pole was relevant because it showed a point of trauma for one of the victims. The gruesome condition of the victim's body was not due to any extraneous causes, but was created solely through the collision with the telephone pole. The trial court also decided that the photograph was probative of the car's velocity at the time of impact, which was a relevant issue because Appellant had chosen to contest that he had been speeding prior to the accident. The trial court acted within its broad discretion in allowing Commonwealth's Exhibit 8 into evidence.

Appellant's second argument is that the trial court erred in finding Appellant guilty of tampering with evidence pursuant to KRS 524.100. When Appellant left the scene of the accident, his blood-alcohol content (BAC) diminished alongside other physical characteristics of intoxication. Appellant was charged with tampering with evidence because his BAC may have provided an evidentiary basis for a conviction for driving under the influence. Appellant contends that the blood that flowed within his veins did not constitute physical evidence for the purpose of KRS 524.100.

No Kentucky case law addresses this question. While the taking of blood samples has been held to be a search for "real or physical evidence,"[8] the blood samples themselves have only been "evidence" when outside the human body. When separated from the ongoing chemical processes of the human body, a blood sample is easily analyzed. In *Sosa v. State*[9] the

3. *Partin v. Commonwealth*, Ky., 918 S.W.2d 219, 222 (1996) (quoting Lawson, *The Kentucky Evidence Law Handbook*, § 2.10 (3d ed.1993)).

4. *Id.* at 222.

5. *Barnett v. Commonwealth*, Ky., 979 S.W.2d 98, 102 (1998).

6. *Id.* at 103.

7. *Id.*

8. *Farmer v. Commonwealth*, Ky.App., 6 S.W.3d 144, 145–46 (1999).

9. 4 P.3d 951 (Alaska 2000).

Supreme Court of Alaska held that a defendant could not be convicted of tampering with physical evidence because he refused to submit to a blood alcohol test.[10] In *State v. Peplow*,[11] the Montana Supreme Court differentiated between intravenous blood and extraneous blood samples for evidentiary purposes, holding:

> Stated otherwise, one's BAC is not evidence until it exists in a state capable of analysis. While one's blood is in his body, it is in a constant state of biochemical flux. This Court has repeatedly recognized the evanescent nature of alcohol levels in a person's blood stream.
>
> Section 61–8–404, MCA,[12] clearly does not contemplate that potentially measurable amounts of alcohol, still within the human body, constitute evidence. Until one's breath or blood has been obtained or collected for analysis, it simply cannot be considered 'physical evidence,' as set forth in § 45–7–207, MCA,[13] or a 'thing presented to the senses,' as explained in § 26–1–101(2), MCA. Because a person's blood alcohol level cannot be determined until he or she expels either a sample of blood, air, or urine, such fluids simply cannot be considered physical evidence prior to being removed from the body. We therefore conclude that physical evidence of one's alcohol content is limited to that which is collected for analysis of the person's blood or breath, under § 61–8–404, MCA.[14]

Kentucky and Montana have comparable tampering statutes. KRS 524.100(1) provides:

> A person is guilty of tampering with physical evidence when, believing that an official proceeding is pending or may be instituted, he:
>
> (a) Destroys, mutilates, conceals, removes or alters physical evidence which he believes is about to be produced or used in the official proceeding with intent to impair its verity or availability in the official proceeding.

Montana's statutory language refers to the alteration, destruction, concealment, or removal of "any record, document, or thing," rather than the term "physical evidence." In addition to the language of the statute itself, § 45–7–207, MCA defines "evidence" as being "the means of ascertaining in a judicial proceeding the truth respecting a question of fact, including but limited to witness testimony, writings, physical objects, or other things presented to the senses." This definition encompasses Kentucky's understanding of physical evidence as being "any article, object, document, record, or other thing of physical substance." [15]

We find the reasoning behind *Peplow* to be sound. By statute, the evidence of a foreign substance in the blood of a defendant that is admissible for a conviction of driving under the influence takes the form of a "scientifically reliable test" result.[16] What makes a blood sample evidence is the ability to glean probative data from it. Appellant's blood, however, while still within his body was continuously subjected to chemical processes. This state of "biochemical flux" left Appellant's blood incapable of an analysis that would yield evidence. If we were to affirm the judgment

---

10. *Id.* at 955.

11. 307 Mont. 172, 36 P.3d 922 (2001).

12. Montana's Driving Under the Influence Statute.

13. Montana's Tampering Statute.

14. *Id.* at 928–929.

15. KRS 524.010(6).

16. KRS 189A.010(1)(a).

of the lower court as to the tampering charge, then as the *Peplow* court stated "conceivably, any driver who eats, sleeps, or even receives medical treatment (i.e., intravenous fluids) after an accident could also be accused of tampering with their blood alcohol level." [17] Because Appellant's intravenous blood was not evidence for the purpose of KRS 542.100, we vacate Appellant's conviction for tampering with the evidence.

Finally, Appellant argues that the trial court incorrectly applied the law in sentencing Appellant to serve his sentences consecutively for a total of 52 years. Appellant contends that the maximum consecutive sentence he can receive for the conviction of Class C and Class D felonies is 20 years. KRS 532.110(1)(c) provides:

> The aggregate of consecutive indeterminate terms shall not exceed in maximum length the longest extended term which would be authorized by KRS 532.080 before the highest class of crime for which any of the sentences is imposed. In no event shall the aggregate of consecutive indeterminate terms exceed seventy (70) years.

Appellant concedes this issue was not preserved for appellate review, but argues it is an issue affecting Appellant's substantial rights and must be reviewed under RCr 10.26.

In order for an unpreserved issue to be reviewed, it must be a palpable error affecting the substantial rights of a party, resulting in manifest injustice. [18] "Manifest injustice" has been held to mean that upon consideration of the whole case, a substantial possibility exists that the re-sult would have been different had the error not occurred. [19] An error must seriously affect the "fairness, integrity, or public reputation" of a judicial proceeding in order to be considered palpable under RCr 10.26. [20]

In the case *sub judice*, the requirements for palpable error have not been met because the application of law by the trial court was not erroneous at all. KRS 532.110(1)(c) does limit the amount of time that can be served in consecutive sentences, but that statute is not the only one that is relevant to Appellant's situation. Because the felonies in question occurred while Appellant was on probation, KRS 533.060(2) becomes applicable as well. KRS 533.060(2) states as following:

> When a person is convicted of a felony and is committed to a correctional detention facility and is released on parole or has been released by the court on probation, shock probation, or conditional discharge, and is convicted or enters a plea of guilty to a felony committed while on parole, probation, shock probation or conditional discharge, the person shall not be eligible for probation, shock probation, or conditional discharge and the period of confinement for that felony shall not run concurrently with any other sentence.

In *Devore v. Commonwealth*, [21] we held that by passing KRS 533.060(2) the General Assembly has shown an interest in singling out repeat offenders who violate the terms of their probation, parole, or conditional discharge. [22] Where an individual who is on parole, probation, shock proba-

17. *Peplow*, 36 P.3d at 929.

18. RCr 10.26.

19. *Graves v. Commonwealth*, Ky., 17 S.W.3d 858, 864 (2000).

20. *United States v. Olano*, 507 U.S. 725, 736, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993).

21. Ky., 662 S.W.2d 829 (1984).

22. *Id.* at 831.

tion, or conditional discharge is convicted or enters a plea of guilty to a felony, their sentences shall not run concurrently.[23] In this situation, KRS 532.110(1)(c) does not act as a sentencing cap.[24] As such, there was no manifest injustice present at trial.

Appellant's conviction of tampering with evidence is vacated. Excluding that conviction, the judgment of the Allen Circuit Court is affirmed.

COOPER, GRAVES, JOHNSTONE, and STUMBO, JJ., concur.

KELLER, J., dissents by separate opinion in which WINTERSHEIMER, J., joins.

WINTERSHEIMER, J., dissents by separate opinion.

Dissenting Opinion by Justice KELLER.

Because the majority declares that for purposes of KRS 524.100 blood cannot be physical evidence until it is withdrawn from a person's body, I dissent. Just as seizure of a murder weapon or illegal drugs does not change those items into evidence, the seizure of blood by withdrawing it from a defendant's body similarly does not change its status. It is the object's involvement in or its relation to the commission of a crime, not the police's seizure of it that alters its status and thus makes it "evidence." The fact that the police take custody of blood does not metaphysically transform it into physical evidence. This, however, is the clear alchemical implication of the majority opinion, which uses police seizure as a philosopher's stone to transmute blood into evidence.

Physical evidence is defined for the purposes of KRS 524.100 as "any article, object, document, record, or other thing of physical substance."[1] Blood, even though not yet drawn or analyzed, is undisputedly a "thing of physical substance." The definition does not support the majority opinion's conclusion that it must be drawn from the body in order to constitute evidence. And the fact that it does not have to be drawn from the body to be altered solidifies my view. I would note that search warrants often issue for the purpose of seizing and testing a person's blood and determining its alcohol concentration.[2] The blood is seized as evidence that might be used in the prosecution of a crime and "[t]he taking of a blood sample from a criminal suspect for testing constitutes a search for real or physical evidence . . . ."[3] Where the alcohol concentration of a criminal suspect's blood is relevant, the suspect's blood is evidence both before and after it is drawn for testing.

A person tampers with physical evidence "when believing that an official proceeding is pending" or may be pending, he or she "conceals, removes or *alters* physical evidence he [or she] believes is about to be produced or used in the . . . proceeding with the intent to impair its veracity or availability in the . . . proceeding."[4] The commentary to the statute states that "[i]f

23. *Id.*

24. *Id.*

1. KRS 524.010.

2. *E.g., Love v. Commonwealth,* 55 S.W.3d 816, 820 (Ky.2001) ("Pursuant to the search warrant, the police drew a sample of blood and collected a urine specimen to determine if Appellant was intoxicated at the time of the accident.").

3. *Farmer v. Commonwealth,* 6 S.W.3d 144, 145–146 (Ky.App.1999) (citing *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966)).

4. KRS 524.100 (emphasis added).

the defendant believed the evidence was to be produced or used in a proceeding and his actions were designed to prevent that from occurring, the elements of proof are satisfied."[5] And I believe the evidence supports the jury's finding that this happened in Appellant's case.

The majority's sole basis for holding otherwise is *State v. Peplow.*[6] However, since *Peplow* is devoid of any evidence of the specific intent to conceal or alter blood alcohol concentration, I do not find it instructive or applicable. In *Peplow,* the defendant had several drinks and then proceeded to drive his truck through several fences at the expense of his truck's radiator. Since this rendered the vehicle inoperable and his house was close by, Peplow staggered home and continued his drinking. After three shots of whiskey he walked to a local bar for a beer where he was eventually apprehended by the police, who charged him with driving under the influence and tampering because he had consumed additional alcohol after the collision. Since any intent Peplow could have had with respect to altering his blood alcohol concentration would not have been in his favor, the Montana Supreme Court's decision that the tampering charge did not apply was reasonable. What was not reasonable was its insistence that blood and its alcohol concentration cannot be evidence until drawn, despite the state's definition of evidence as a " 'record, document or thing.' "[7] In interpreting the definition, the trial court stated, " 'I can't imagine a more broad term than 'thing.' That's not defined in the code so I think we have to apply its ordinary meaning and that would cover just about anything.' "[8] The trial court was correct.

As in Kentucky, Montana's tampering with physical evidence statute requires that the evidence be concealed or altered *with the purpose* to impair its veracity or availability. There is no evidence that Peplow consumed three shots of whiskey and half a beer in order to skew the results of any blood alcohol test, especially since his actions would not have skewed the test results in his favor.

In Appellant's case, he was on probation and recognized that he faced probation revocation and possibly additional prison time if he was discovered intoxicated at the scene of the collision. In an effort to avoid the consequences, Appellant fled and covered his tracks by having his brother accept responsibility for driving the car. Appellant knew a proceeding would be instituted against him and he hid to avoid prosecution for driving while intoxicated and violating his probation. The jury's finding that he did so to alter the alcohol concentration of his blood is a reasonable inference based on the evidence.[9] If Appellant had truly wrecked due only to the road conditions he would not have left his fatally injured sister and niece and would not have continued to insist that his brother was the driver when he was questioned by police.

The Court in *Peplow* was concerned that if blood alcohol concentration could be considered evidence before blood was drawn,

---

**5.** KRS 524.100 Kentucky Crime Commission/LRC Commentary (1974).

**6.** 307 Mont. 172, 36 P.3d 922 (2001).

**7.** 36 P.3d at 927.

**8.** *Id.*

**9.** *See Schmerber v. California,* 384 U.S. 757, 770, 86 S.Ct. 1826, 1835–1836, 16 L.Ed.2d 908 (1966) ("The officer in the present case, however, might reasonably have believed that he was confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened 'the destruction of evidence.' ").

then "any driver who eats, sleeps or even receives medical treatment ... after an accident could also be accused of tampering with their blood alcohol level."[10] But if a driver does those things *in an effort to alter his or her blood alcohol level,* then he or she has most certainly tampered with physical evidence. Returning to the commentary discussed earlier, "[i]f the defendant believed the evidence was to be produced or used in a proceeding *and his actions were designed to prevent that from occurring,* the elements of proof are satisfied."[11] I believe the elements were satisfied in Appellant's case.

For the foregoing reasons I dissent and would affirm Appellant's conviction under KRS 524.100.

WINTERSHEIMER, J., joins this dissenting opinion.

Dissenting Opinion by Justice WINTERSHEIMER.

I must respectfully dissent from the majority opinion because the charge of tampering with physical evidence was properly submitted to the jury. KRS 524.100(1)(a). The defendant was not entitled to a directed verdict.

Page was convicted of second-degree manslaughter and first-degree wanton endangerment as well as tampering with physical evidence. In this case, there was evidence that Page concealed himself after his crime and thereby prevented police from obtaining a blood sample. There is no question that blood is physical evidence and concealment of such physical evidence would justify submitting the tampering charge to a jury. The trial judge admitted that the determination was a "close call" but determined that the definition "seems to apply." The trial judge promised he

would take another look at the issue upon receipt of a post-judgment motion for relief. Defense counsel did not present any further motions regarding the issue and declined to do so when the trial judge solicited his motions at the end of the trial.

It is uncontroverted that Page wrecked his automobile which resulted in the deaths of his sister and a six-year old niece. He then fled, cleaned his own injuries and encouraged a false, or at least misleading, statement to police by his brother.

This Court as well as the United States Supreme Court has properly recognized the evidentiary importance of the blood of a criminal defendant. *See Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); *Speers v. Commonwealth,* Ky., 828 S.W.2d 638 (1992). It is in the nature of blood to have a tendency to change quickly as a result of normal body function and this produces an elimination of drugs and alcohol. Consequently, there is a compelling state interest in the expedient collection of blood evidence after a drug or alcohol-related offense. There is no sacred attachment to the blood contained in the body because the sample must be obtained from blood in the body. The reliance by the majority opinion on the integrity of body blood is unconvincing.

Page concealed himself after the crime because he did not want the police to observe him. He was afraid that he would be arrested and that he would have to go back to prison. The blood evidence was not readily available when the police finally apprehended Page because of the acts of concealment.

Reliance by the majority on *State v. Peplow,* 307 Mont. 172, 36 P.3d 922 (2001),

---

**10.** *Id.* at 929.

**11.** KRS 524.100 Kentucky Crime Commission/LRC Commentary (emphasis added).

is unpersuasive. *Peplow, supra,* is very different. The Montana Supreme Court said that standing alone, the consumption of alcohol after the accident was not sufficient evidence of tampering. The comparison to the innocent eating, sleeping or medicine ingestion is misplaced. Here, the defendant fled, cleaned his appearance and encouraged misleading information. In this case, the conviction of Page is not based on some kind of isolated or facially innocent conduct.

The Montana statute does not define "physical evidence." Kentucky does in Chapter 524, and the definition is comprehensive enough to include a sample of the defendant's blood. The blood sample must come from blood in the body. It logically follows that if the source of the sample is concealed by the defendant, the blood evidence is certainly tampered with. The charge was correct and the jury was entitled to decide.

The judgment of conviction of the tampering with evidence charge should be affirmed.